## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JOSHUA KEITH DAVIS,

            PETITIONER,           CIVIL ACTION No. 03-73306

v.                          HONORABLE ARTHUR J. TARNOW
                              UNITED STATES DISTRICT JUDGE

KURT JONES,

                          MAGISTRATE PAUL J. KOMIVES
            RESPONDENT.

## OPINION & ORDER

## I.    Introduction

Petitioner Joshua Keith Davis is a state prisoner, currently confined at the Carson City Correctional Facility in Carson City, Michigan. At the conclusion of a bench trial in Wayne County Circuit Court, Petitioner was convicted of the second-degree murder and sentenced to 28-70 years' imprisonment.

Petitioner, proceeding *pro se*, filed the instant application for the writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 on August 29, 2003 raising two claims. The Magistrate Judge issued a Report and Recommendation suggesting an evidentiary hearing on the Miranda issue and a denial on the ineffectiveness of counsel issue. This Court adopted it in part. As a result, counsel was appointed to represent Petitioner.

An evidentiary hearing was held on two issues: 1) Petitioner's Fifth Amendment *Miranda v. Arizona*, 384 U.S. 436 (1966) claim related to his first

statement to police; and 2) Petitioner's ineffective assistance of trial counsel claim for failing to raise the issue of whether the second statement were voluntarily made after being held in a spartan holding cell for 72 hours without being brought before a court in violation of *County of Riverside v. McLaughlin*, 50 U.S. 44 (1991).

From the uncontroverted testimony at the hearing, soon after the crime: Petitioner, who had knowledge as to who committed the crime, sought the advice of his employer Rex Bradley.   Bradley in turn advised that Petitioner should share the information with the police.  Bradley arranged a meeting between Petitioner and Detective Allen of the Detroit Police Department at an area Burger King. Bradley was told the Detective would be alone.

For the most part, the details of the meeting and subsequent arrest are not disputed.  After entering the restaurant and being introduced, Petitioner and Det. Allen sat together.  Det. Allen began questioning Petitioner about what he knew, what role he played, and how Petitioner had obtained his information about the incident without reading him *Miranda* rights.  At some point, Petitioner became alarmed at the situation and stood to leave.  The other officers in the restaurant reacted.  It was about this time that Petitioner claims to have requested a lawyer. Respondent disputes this.

Petitioner left the Burger King at approximately 7:15 pm on June 25, 1999, under arrest.  He was handcuffed and placed in a police car.  He arrived at the police station in handcuffs and was taken into the building.  At the station, Detective Allen used notes from the Burger King meeting and asked

Petitioner questions about the incident while Petitioner was handcuffed to the table. Petitioner was advised of his *Miranda* rights, signed a *Miranda* rights waiver form, and made a statement that was somewhat inculpatory.

After being booked, Petitioner was put into a single man cell on the 9th floor measuring approximately 7' x 10', with a wooden slab to sleep on but no mattress, pillow or blanket. The cell included a toilet and basin. The cell door had open bars but that provided little relief from Detroit's end of June heat. Petitioner could move around the cell and was not handcuffed. Petitioner was in the cell from Friday night until Monday at around 1:00 pm. During the weekend, no one other than officers came to talk to him. He had no visitors and he was not allowed to make a phone call. While in custody, Petitioner asked Det. Allen to call Petitioner's girlfriend so she could call Bradley. Allen called the number given to him by Petitioner but there was no answer.

Two days after the original arrest but before his arraignment, the second police interview of Petitioner occurred. This interview was conducted by Officer Michelle Jones and Officer Russell. Prior to making his statement, Petitioner alleges threats and abuse by Officer Michael Russell and claims that he also requested an attorney at this time. The trial court found that Petitioner did not request a lawyer at this time. Regardless, this Court does not rely on these allegations in coming to its conclusion that he was denied the effective assistance of trial counsel.

What is undisputed is that Officer Jones read Petitioner his *Miranda* rights and Petitioner initialed and signed the form. Officer Russell took Petitioner to a room where the officer typed his questions and Petitioner's answers. When Russell finished typing, he asked Petitioner to initial his answers and sign, date and time the statement. Petitioner did so.

It was only after he made the second statement that Petitioner was taken before a magistrate who made the probable cause determination. In total, 96 hours had passed between the time of his initial arrest and his arraignment, twice the Fourth Amendment limit. Moreover, this was the third time that the police had spoken to Petitioner concerning his involvement within 72 hours: 1) at the Burger King, 2) at the police station on June 25, and 3) again on June 28. The fact that there was a lot of community pressure to find someone to charge with the murder perhaps explains why the officers felt required to interview him on more than one occasion in such a short period of time.

Petitioner is entitled to *habeas corpus* relief based on each of his two claims. That is, his *Miranda* rights were violated as to his first statement and the failure of trial counsel to raise the issue of the impact of the delay in being taken before a magistrate on the question of voluntariness of the last statement was ineffective assistance of counsel for the reasons stated below.

## II.    History

Petitioner along with Richard Kimble and Devon Davis were charged with first-degree felony murder in connection with the shooting of Monqiue Trotty on June 23, 1999. Petitioner made two statements while in police custody, the first on June 25, 1999 and the second on June 28, 1999.

Prior to trial, Petitioner moved to suppress his statements on the basis that the police had interrogated him after he had invoked his right to counsel in violation of *Miranda v. Arizona*, *supra*. The trial court held an evidentiary hearing on the matter pursuant to *People v. Walker*. 374 Mich. 331 (1965).

At the evidentiary hearing, Defense Counsel asked Rex Bradley "did Josh say anything about a lawyer?" The prosecutor objected on grounds of hearsay. The objection was sustained. On cross, Bradley admitted that Davis had not said that he wanted a lawyer before the meeting at the Burger King but he slipped in that "he did during the meeting." Davis testified that he asked for a lawyer 35-45 minutes into his conversation with Det. Allen. He also testified that Davis tried to leave the restaurant but was blocked by other officers. After this time, Davis claims to have repeatedly asked for a lawyer including when he was interviewed on June 28.

The trial judge denied the motion to suppress, finding that the statements were voluntarily made. The court did not believe Joshua Davis' hearing testimony that he requested an attorney, finding instead that "defendant never requested a lawyer at any time." The court also determined that "defendant was not under arrest" when he met and spoke with Det. Allen at the Burger King. In making this

determination, the Circuit Judge refused to consider the testimony of Joshua Davis' employer, Rex Bradley, who was willing to corroborate Davis' testimony that he requested an attorney during a meeting between Davis and Detroit Police Department Officers at a local Burger King.

On the first day of trial, Davis' new trial counsel filed a second motion to suppress arguing that Davis' second statement to police was involuntary due to the length of delay between the arrests and the statement. The trial judge denied the motion, ruling that "as far as I'm concerned, that issue has already been litigated and the Court has made a decision, and so it is untimely at this time."

Joshua Davis was tried jointly with codefendant Richard Kimble. Both Davis and Kimble waived their rights to a jury, despite the fact that the judge, who found Davis' hearing testimony not credible, would be the trier of fact.

At trial, there was little evidence connecting Joshua Davis to the shooting. The surviving victims could not identify the man who shot Ms. Trotty in the shoulder, other than to say he was 17-25, black male of medium build and had a beard.

Codefendant Richard Kimble's girlfriend, Lakiya Bryant testified that she was at home when Joshua Davis and Devon "Baby Joe" Davis brought gold tire rims to her house to store in her basement.

Officer Michelle Jones read into the record the statement made by Richard "Snoop" Kimble in the evening of June 28, 1999, which detailed the events surrounding the shooting of Monique Trotty. The statement did inculpate Joshua

Davis but the statement was properly not admitted into evidence against Davis, but heard by the trial judge fact finder.

Det. Allen read into evidence Joshua Davis' June 25, 1999 statement in which Davis stated that he gave Richard Kimble and Devon Davis a ride to a house near Seven Mile Road, let them out, and drove away.

Officer Michelle Jones and Officer Michael Russell testified about interrogating Davis at police headquarters on Monday, June 28, 1999. Officer Russell read into the record Davis' June 28 statement, in which Davis admitted that he had been with Joe and Snoop looking for a car with tire rims that they could sell. They followed a white Oldsmobile with gold Dayton rims until it pulled into a driveway. Joe and Snoop then got out of the car. Davis waited for them and he heard a gunshot. Davis also admitted that he had known Snoop was carrying a gun because Snoop had shown it to him as they were driving around.

No witness testified for either defendant at trial. Thus, the only admissible evidence placing Davis as a participant of the crime was his second statement to police made while in custody on June 28, 1999.

On March 13, 2000, Petitioner and Kimble were convicted of one count of second-degree murder, Mich. Comp. Laws 750.317. The court acquitted both Davis and Kimble of the carjacking charge.

On April 13, 2000, Davis was sentenced to a term of 28-70 years' imprisonment. He appealed as a matter of right to the Michigan Court of Appeals raising four issues. The Court of Appeals found no merit to the claims, and

affirmed his conviction and sentence.  *People v. Davis*, No. 22730, 2002 WL

1747966 (Mich. Ct. App. July 23 2002) (*per curiam*).  Davis sought leave to

appeal his three issues to the Michigan Supreme Court but this was denied in a

standard order.  *People v. Davis*, 658 N.W.2d 486 (2003).

## III.    The Standard of Review

Davis' petition is governed by the Antiterrorism and Effective Death Penalty

Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1995).

Section 2254(d) of Title 28 U.S.C., imposes the following standard of review for

*habeas* cases:

> An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in State
> court proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceedings.28 U.S.C. § 2254(d). Additionally, this Court
> must presume the correctness of state court factual determinations. 28
> U.S.C. § 2254(e)(1).

A decision of a state court is "contrary to" clearly established federal law if

the state court arrives at a conclusion opposite to that reached by the Supreme

Court on a question of law or if the state court decides a case differently than the

Supreme Court has on a set of materially indistinguishable facts. *Williams v.*

*Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application occurs" when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case."  *Id*. at 409.  A federal court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id*. at 410-11.

## IV.   *Miranda* Issues

Petitioner contends that the officers who arrested and interrogated him violated his Fifth Amendment right to counsel pursuant to *Miranda v. Arizona, supra*, when he was subject to a custodial interrogation at the Burger King without being advised of his right to an attorney and twice again when his requests for an attorney were not honored before he was interviewed later at the police station.

The Fifth Amendment, which is made applicable to the states by the Fourteenth Amendment, protects an accused from compulsory self-incrimination. In *Miranda v. Arizona*, the Supreme Court held that this prohibition against compelled self-incrimination requires that a custodial interrogation be preceded by advice that the putative defendant has the right to an attorney and the right to remain silent. 384 U.S. at 479.  Custody is determined by examining whether a reasonable person in the suspect's position would believe that he or she was free to leave.  *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984); see also *Stansbury v. California*, 511 U.S. 318, 323 (1994) ("The initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective

views harbored by either the interrogating officers or the person being questioned."). "Courts must examine all of the circumstances surrounding the interrogation and determine how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004).

The Court in *Miranda* further held that if the putative defendant invokes his right to counsel, "the interrogation must cease until an attorney is present." 384 U.S. at 474. In *Edwards v. Arizona*, the Supreme Court "reconfirmed" the rule established in *Miranda*, that, when a suspect has invoked the right to have counsel present during custodial interrogation the suspect may not be "subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. 477, 484-85 (1981); see also *United States v. Dupree*, 323 F.3d 480, 486 (6th Cir. 2003). Further, after a suspect has invoked his right to counsel, "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." 451 U.S. at 484.

The issue of whether Petitioner's statements on June 25, 1999 violated *Miranda v. Arizona*, *supra*, was previously addressed by both the trial court and the Michigan Court of Appeals. *See People v. Davis,* 2002 Mich. App. LEXIS 1102 (Mich. Ct. App. 2002). Both courts' decisions involved an unreasonable application of clearly established Federal law.

The trial court denied Davis' motion to suppress because it determined that he had not requested an attorney at any time. In coming to this conclusion, the court refused to hear Rex Bradley's corroborating testimony, though Bradley was able to mention it during his testimony.

The Michigan Court of Appeals correctly determined that the court erred when it impermissibly excluded Rex Bradley's corroborating testimony that Petitioner requested an attorney by sustaining the prosecutor's objection on the basis of hearsay.

> Because a suppression hearing concerns a preliminary question regarding the admissibility of evidence, the rules of evidence do not apply. *People v Richardson*, 204 Mich. App. 71, 80; 514 N.W.2d 503 (1994); MRE 104(a). Therefore, while the statement was arguably hearsay, the trial court erred by sustaining the prosecutor's objection on that basis.

*Id*.

However, the Appellate Court reasoned that because Bradley later interjected this evidence during his testimony, the error was harmless:

> [T]he witness offering the disputed testimony later interjected that defendant asked for an attorney when he was detained by the police. Because the information was subsequently received, defendant was not prejudiced by the court's erroneous ruling. Moreover, despite the witness' and defendant's own testimony that defendant requested a lawyer, the court made a credibility determination and concluded that defendant 'never requested a lawyer at any time.'

*Id*.

Although Bradley's corroborating testimony was interjected at the evidentiary hearing, this was an isolated statement which counsel was not permitted to explore or argue.  The trial judge heard no testimony from Bradley on the nature of Petitioner's request for counsel, the circumstances surrounding the request, or Detective Allen's response.

More importantly, the appellate court's harmless error conclusion implies that because the trial judge heard Bradley's interjection, he must have considered it in making his ultimate ruling.  "Trial courts are presumed... to give no weight to improper testimonial evidence, which is taken under objection." *West v. Jones*, 2006 WL 508652, at 3 (E.D. Mich. 2006) (citing *United States v. McCarthy*, 470 F.2d 222, 224 (6th Cir. 1972)); see also, *Harris v. Rivera*, 454 U.S. 339, 346 (1981) ("In bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions.").

Thus, it was an unreasonable application of federal law for the Michigan Court of Appeals to assume the trial court considered Bradley's statement and rejected that testimony.  Moreover, it should be noted that the testimony was impermissibly excluded because the testimony was also not offered for the truth of the matter but instead to verify only the fact that the request was made. See Fed. R. of Ev. 801, *et. seq*.

The Court held an evidentiary hearing on the issue.

As noted before, from the uncontroverted testimony at the hearing, soon after the crime, Petitioner sought the help of his employer Rex Bradley.  Bradley in

turn arranged a meeting between Petitioner and Detective Allen of the Detroit Police Department at an area Burger King.

After entering the restaurant and being introduced to the officer by Bradley, Petitioner sat with Det. Allen in a booth at the Burger King. Det. Allen questioned Petitioner about what he knew, what role he played, and how Petitioner had obtained his information about the incident without reading him *Miranda* rights. At some point, Petitioner became alarmed at the situation and stood to leave, which caused the other officers in the restaurant to react. Sensing he was under arrest, Petitioner claims to have requested a lawyer. Respondent disputes this.

Petitioner left Burger King at approximately 7:15 pm on June 25, 1999, while under arrest. He was handcuffed, placed in the police car and taken to the police station. At the station, Det. Allen used his notes from the Burger King meeting to further interview Petitioner about the incident. It was at this time that Petitioner was first advised of his *Miranda* rights. He signed and initialed a *Miranda* rights waiver form, and made a statement that was somewhat inculpatory.

Based on the evidentiary hearing testimony, there are two genuine disputes between the parties, one legal that involves questions of fact, the other factual. The legal dispute is whether Petitioner was "in custody" when he arrived at Burger King. If he were "in custody" at any time during the meeting, Det. Allen would have been under a Fifth Amendment obligation to apprise him of his *Miranda* rights. Petitioner argues that this duty existed immediately before Det. Allen posed the first question at the Burger King because the interview was a "planned

custodial interrogation and by questioning first it violated Petitioner's Fifth Amendment rights."

Respondent argues that meeting and conversation was not a "custodial interrogation" subject to Fifth Amendment constraints. Petitioner voluntarily came to the meeting and initially was free to leave at any time. However, Respondent acknowledges that at some point in the conversation, Petitioner became a suspect in the murder. "There was a shift in focus during that interrogation… [After an hour to an hour and a half at the restaurant] the focus in the investigation shifted, according to Officer Allen's testimony, and he informed Petitioner that he would like to continue the questioning down at the station." June 25, 2007 Tr. at 6-7.

The factual dispute is whether Petitioner did in fact request an attorney. Petitioner has consistently testified throughout the circuit court's *Walker* hearing and this Court's evidentiary hearing that he requested counsel more than once. Rex Bradley's testimony at this Court's evidentiary hearing and his unconsidered interjection at the *Walker* hearing lend support to Petitioner's contention. In contrast, Respondent points to Det. Allen's prior testimony in which he denies that Davis ever made such a request.

The Court finds as a matter of fact, that given Petitioner's consistent testimony supported by his employer Bradley, that Petitioner did request counsel. Therefore, Petitioner Davis is entitled to *habeas corpus* relief.

The Sixth Circuit summarized harmless-error review in *Forensic v. Birkett*, __ F.3d __, 2007 U.S. App. LEXIS 21090 (6th Cir. Sept. 4, 2007). A constitutional

error is not harmless if it had "substantial and injurious effect or influence in determining the jury's verdict." *Id*. at 32. Even though *habeas* petitioners are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice, petitioner do not bear an affirmative burden of proof. *Id*. "Instead, it is conceptually clearer for the judge to ask directly, 'Do I, the judge, think that the error substantially influenced the jury's decision?' than for the judge to try to put the same question in terms of proof burdens (*e.g.*, 'D I believe the party has borne it burden of showing…?')." *Id*. (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436-37 (1995). "Uncertainty in answering this question… militates in favor of the *habeas* petitioner." *Id*.

Although not nearly as inculpatory as the second statement, the first statement was the only other evidence linking Petitioner to area where the crime occurred. The trial court's error in admitting Petitioner's first statement causes this Court to be "in grave doubt" about whether this error of federal law had a "substantial and injurious effect or influence in determining" the verdict. Thus, the error is not harmless.

## V. Ineffective Assistance of Counsel for Failure to Timely Raise a Challenge to the Length of Delay in Arraignment as Causing the Last Statement.

Petitioner's second claim concerns the inordinate amount of time between his arrest at the Burger King in the evening of Friday, June 25, 1999 and his eventual arraignment in the afternoon on Monday, June 28, 1999: 96 hours.

Petitioner argues that he was deprived of the effective assistance of counsel and due process of law because the trial attorney failed to raise a Fourth Amendment *County of Riverside v. McLaughlin*, *supra*, violation as a reason to suppress his June 28 statement made to police. As the Michigan Court of Appeals determined, the second statement was 72 hours after the initial arrest and the arraignment did not occur until 96 hours after the arrest. In addressing this issue, this Court assumes that Petitioner was not under arrest at the Burger King until he attempted to leave the restaurant.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-pronged test for determining whether a *habeas* petitioner has received ineffective assistance of counsel. First, a petitioner must prove that counsel's performance was deficient, which "requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id*. at 687. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (quoting *Strickland*, 466 U.S. at 688; additional internal quotations omitted). However, when assessing counsel's performance, the reviewing court should afford counsel great deference. *Strickland*, 466 U.S. at 689 (observing that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the

circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time" and that a convicted person who seeks to criticize his attorney's performance "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.")

Second, a petitioner must show that counsel's deficient performance prejudiced him. A petitioner may establish prejudice by "showing that counsel's errors were so serious as to deprive the defendant of a fair trial." *Id*. Where the claim is based on a failure to litigate a Fourth Amendment claim, petitioner must show that the there is a reasonable probability that the verdict would have been different without the excluded evidence. *Kimmelman v. Morrison*, 477 U.S. 365 (1986).

Petitioner's claim of ineffective assistance of counsel stems from his trial counsel's failure to raise the Fourth Amendment violation relating to his pre-arraignment delay during the *Walker* hearing. In terms of prejudice, Petitioner argues that had the issue been raised during the hearing before the trial, the court would have suppressed his second, more inculpatory statement.

The Sixth Circuit succinctly summarized the Fourth Amendment issue involved in this case in *Alkire v. Irving*.

> [The Fourth Amendment] requires a "fair and reliable
> determination of probable cause," which must be made
> promptly after a warrantless arrest. *Gerstein v. Pugh*, 420 U.S.
> 103, 125, (1975). A judicial determination of probable cause
> within forty-eight hours of arrest, "will, as a general matter,

> comply with the promptness requirement of Gerstein." *County of Riverside of Riverside v. McLaughlin*, 500 U.S. 44, 56, 114 (1991). If the probable cause hearing is not held within forty-eight hours, the burden shifts to the government "to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." *Id.* at 57. The Supreme Court specifically mentioned that intervening weekends do not count as an "extraordinary circumstance." *Id.*

*Alkire v. Irving*, 330 F.3d 802, 813-814 (6th Cir. 2003).

This Court agrees with the Magistrate's summary of the appropriate remedy for such a violation in Michigan.

> The Supreme Court has explicitly declined to rule on the appropriate remedy for a *McLaughlin* violation, *see Powell v. Nevada*, 511 U.S. 79, 84 (1994) and the Michigan courts have held that suppression of a statement is not *per se* required for a *McLaughlin* violation. *See People v. Manning*, 243 Mich.App. 615, 636-44... (2000). Rather the existence of a delay is merely a factor to be considered in determining whether a statement was voluntary. *See id.* Thus, the existence of a *McLaughlin* violation alone does not require suppression of a custodial statement given after arrest but before arraignment.

The voluntariness inquiry under the Due Process Clause is separate from whether *Miranda*'s requirements regarding the Fifth Amendment privilege against self-incrimination are satisfied. *Dickerson v. United States*, 530 U.S. 428, 444, 147 L. Ed. 2d 405, 120 S. Ct. 2326 (2000) ("The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry.")

In *Culombe v. Connecticut*, the Supreme Court described the voluntariness test:

> The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker?… If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

367 U.S. 568, 602 (1961).

A court must look at the totality of the circumstances, including the defendant's will and the police coercion alleged, to determine if a confession is voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) (in discussing the standards for a consent search under the Fourth Amendment, the Court examined the voluntariness test as applied to confessions); *Haynes v. Washington*, 373 U.S. 503, 513 (1963).

To comply with the Fifth Amendment voluntariness requirement, Michigan courts have adopted balancing test that was announced in *People v. Cipriano*, 431 Mich. 315, 334 (1988). In *Cipriano*, the Michigan Supreme Court outlined the factors to determine a confession's voluntariness.

> The age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in the bringing him before the magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical at attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*Id*. at 334.

In this case, there was unquestionably a *County of Riverside v. McLaughlin* violation because Petitioner was not arraigned until 96 hours after his arrest. At the *Walker* hearing, the trial attorney challenged the voluntariness of Davis' second statement but failed to raise this issue of pre-arraignment delay as a basis for suppressing his second statement. The trial court in finding that the statement was voluntary addressed some of the *Cipriano* factors but not the factor of pre-arraignment delay or the full testimony of Rex Bradley.

The Michigan Court of Appeals determined despite the unconstitutional pre-arraignment delay, under the totality of the circumstances test, Petitioner's second statement was the product of a free and deliberate choice rather than police intimidation, coercion or deception. *Davis*, 202 Mich. App. LEXIS at 7. The Court concluded that "defense counsel was not ineffective for failing to raise the issue of pre-arraignment delay at the time of the *Walker* hearing." *Id*. at 8.

This Court finds that Petitioner's trial counsel provided deficient performance by failing to raise the Fourth Amendment violation in the *Walker* hearing. Trial counsel's performance can be said to have been outside the range of reasonable professional assistance for not having filed a motion to suppress based on a *McLaughlin* error. Had trial counsel done so, the *McLaughlin* constitutional

violation would have been relevant to the trial court's voluntariness inquiry. This Court cannot think of any strategic reason for not raising this issue during *Walker* hearing, nor did Respondent offer any theories, since raising the Fourth Amendment violation could only have weighed in his favor in a voluntariness balancing test.

In terms of prejudice, this Court further finds that the performance was so deficient that it prejudiced Petitioner. The delay itself was never fully addressed, thereby helping to create an incomplete record. An incomplete record that the Court of Appeals used to determine that Petitioner's claim of ineffective assistance of counsel for failing to raise the *McLaughlin* error was without merit. Had either the trial court or the Court of Appeals properly considered a complete record of the delay and the other *Cipriano* factors, the statement would have been suppressed. The appellate court's failure to find ineffective assistance of counsel was an unreasonable application of *Strickland* and its progeny.

As mentioned previously, in the evening of June 25, 1999 Petitioner was taken to a police station around 7:15 p.m., where he signed a *Miranda* form and gave a statement. After being booked, Petitioner was put into a single man cell on the 9th floor measuring approximately 7' x 10', with a wooden slab to sleep on but no mattress, pillow or blanket. Although the cell had open bars, it was hot since it was the end of June in Detroit. Petitioner was not handcuffed and could move around the cell. Petitioner was in the cell from Friday night until Monday at around 1:00 pm. Other

than officers, Petitioner had no visitors and he was not allowed to make a phone call.  At Petitioner's request, Det. Allen attempted to call Petitioner's girlfriend so she could call Bradley.  Allen called the number given to him by Petitioner but there was no answer.

Two days after the arrest but before an arraignment, Officer Michelle Jones and Officer Michael Russell conducted the third interview of Petitioner.  During the interview but prior to him giving a statement, Petitioner alleges that Officer Russell threatened and abused him.  Petitioner also claims that he also requested an attorney at this time.  The trial court found that Petitioner did not request a lawyer at this time.  This Court does not rely on these allegations in coming to its conclusion that he was denied the effective assistance of trial counsel.

What is undisputed is that Officer Jones read Petitioner his *Miranda* rights and Petitioner initialed and signed the form.  After typing his questions and Petitioner's answers, Officer Russell asked and Petitioner agreed to initial his answers and sign, date and time the statement.

It was only after he made the second statement that Petitioner was taken before a magistrate who made the probable cause determination.  In total, 96 hours had passed between the time of his initial arrest and his arraignment, twice the Fourth Amendment limit.  Moreover, this was the third time that the police had spoken to Petitioner concerning his involvement within 72 hours, at the Burger King, at the police station on

June 25, and again on June 28.  The fact that there was a lot of community

pressure to find someone to charge with the murder perhaps explains why

the officers felt required to interview him on more than one occasion in such

a short period of time.

       In terms of sophistication, Petitioner was a twenty-two year old who had his

GED.  In addition, he was also recently paroled for a juvenile conviction of armed

robbery and felony firearm thereby making him somewhat experienced with law

enforcement.  However, Petitioner's actions demonstrate a lack of sophistication.

Instead of calling of an attorney, he called his employer to act as an intermediary.

At the meeting, he parked two blocks away from the Burger King and when he

arrived he failed to notice that it was populated by at least three police officers and

by the time of his arrest even more.

       The state evidentiary hearing did not elicit any testimony relevant to the

*McLaughlin* reasonableness issue or the critical testimony of the assault by Officer

Russell on Petitioner to get him to talk.  The attorney's failure was ineffective

assistance of counsel.  It prejudiced Petitioner because the delay issue was never

fully addressed depriving Petitioner of his due process rights to litigate this valid

Fourth Amendment claim.  Second, the failure to litigate the delay claim resulted in

an incomplete record which the Court of Appeals used to determine that

Petitioner's claims were meritless.  Third, Petitioner's delay claim was meritorious

and should have resulted in suppression of the statement given to Officer Russell,

which was the most inculpatory statement Petitioner gave.  It was the only

evidence directly implicating him in the carjacking or the murder. Petitioner's attorney was ineffective for failing to challenge the delay because there was nothing to lose and everything to gain.

Because this second statement was the only practical evidence of Petitioner Davis' involvement in the carjacking plan which resulted in the murder of Ms. Trotty, there is a reasonable probability that the verdict would have been different without the excluded evidence. *Kimmelman*, 477 U.S. at 375. In terms of harmless error analysis as to the admission of the second statement, the Respondent conceded at oral argument that if the second statement were erroneously admitted that the error would have been harmful and not harmless.

## VI.    Conclusion

For the foregoing reasons, this Court rejects the Magistrate's Report and Recommendation concerning the ineffective assistance of counsel claim and grants *habeas corpus* relief on both issues. Accordingly, it is ordered that the Petition for a writ of *habeas corpus* is **GRANTED**. The State shall release Petitioner unless it retries him within sixty days of the date of this order.

S/Arthur J. Tarnow
Arthur J. Tarnow
United States District Judge

Dated:  September 13, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 13, 2007, by electronic and/or ordinary mail.

<u>S/Catherine A. Pickles</u>
Judicial Secretary